EDITH JUANITA BROWN, Adm'r of the Estate of Clearthis Knox, Jr., Deceased, Plaintiff-Appellee, v. ARCO PETROLEUM PRODUCTS COMPANY *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 1—87—3343

Opinion filed November 22, 1989.—Modified opinion filed April 11, 1990.—Rehearing denied April 16, 1990.

FREEMAN, J., specially concurring.
RIZZI, J., dissenting.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Paul B. O'Flaherty, Jr., and Thomas W. Cushing, of counsel), for appellants.

Fishman & Fishman and DeBofsky & DeBofsky, both of Chicago (Mark D. DeBofsky, of counsel), for appellee.

JUSTICE WHITE delivered the opinion of the court:

Defendants, Arco Petroleum Products Company (Arco) and Kenneth Roland, appeal from a jury verdict awarding $2 million in damages to the estate of Clearthis Knox. Defendants argue that the judgment should be reversed because they were prejudiced and denied a fair trial by erroneous rulings made in the trial court and by improprieties in plaintiff's counsel's impeachment of witnesses and in his closing arguments. In the alternative, defendants argue that the jury's award of damages was excessive and should be reduced.

Clearthis Knox, decedent, was killed on July 28, 1981, when his car collided with a tanker truck owned by Arco and driven by Roland. The accident occurred in Elk Grove Village at the intersection of Busse Highway and Marathon Road. Marathon Road is a private street leading to a Marathon oil terminal, which is used by Marathon and Arco drivers to refuel their tankers. In 1981, there were no traffic signals at the intersection but there was a stop sign on Marathon Road a few feet east of Busse.

On the night of the accident, Roland refueled his truck and left the Marathon terminal. Roland then began travelling west on Marathon Road, toward Busse Highway. Decedent, who was travelling north on Busse, struck Roland's truck as it pulled into the intersection and crossed the northbound lanes of the highway. Decedent was killed instantly. An autopsy performed on decedent revealed a blood-alcohol level of .155, 1½ times the legal limit, and a bile-alcohol level of .140.

On February 18, 1982, Edith Brown, administrator of decedent's estate, filed this wrongful death action against defendants, seeking $1.5 million in damages. A jury found for plaintiff, returning a verdict

in the amount of $2 million, but because the jury also found that plaintiff was 10% responsible for the accident, the verdict was reduced to $1.8 million.

In their appeal, defendants contend that the judgment should be reversed due to the number of trial errors that occurred and because of the many instances of improper conduct on the part of plaintiff's counsel.

It is well settled that a judgment should be reversed because of error only when it appears that the error affected the result of the trial. (*Khatib v. McDonald* (1980), 87 Ill. App. 3d 1087, 410 N.E.2d 266; *Chloupek v. Jordan* (1977), 49 Ill. App. 3d 809, 564 N.E.2d 650.) In reviewing a jury's verdict, an appeals court need not determine that the record is free from error (*Karsten v. McCray* (1987), 157 Ill. App. 3d 1, 509 N.E.2d 1367); rather, the court need only determine whether any error occurred which operated to the prejudice of a party or which unduly affected the outcome (*Karsten v. McCray* (1987), 157 Ill. App. 3d 1, 509 N.E.2d 1367; *Stromquist v. Burlington Northern, Inc.* (1983), 112 Ill. App. 3d 37, 444 N.E.2d 1113; *Chloupek v. Jordan* (1977), 49 Ill. App. 3d 809, 564 N.E.2d 650). Our review of the verdict before us leads us to conclude that the trial court's judgment must be reversed and remanded for a new trial.

Defendants have presented a long list of alleged errors and instances of improper conduct by plaintiff's counsel. Defendants assert that the first instance of improper conduct occurred before trial, when plaintiff's counsel asked a potential juror if he knew any of the 150 attorneys at defendant's law firm. Defendants contend that their motion for a mistrial should have been granted since counsel's statement was extremely prejudicial and suggested an unfair financial advantage on the part of defendants.

The transcript of the *voir dire* shows that at the start of jury selection, the trial court addressed the entire venire, asking them if they knew any of the parties or their attorneys. The court then questioned the jurors individually, asking each if he knew any of the parties, the attorneys, or their law firms. Thus, it is clear that plaintiff's counsel's statement served no purpose, except to draw attention to the size of defendants' law firm, and was highly improper. However, an objection immediately was made by defendants' counsel and, during a sidebar conference, the trial court instructed plaintiff's counsel to refrain from making such remarks. Although we find no abuse of discretion in the trial court's denial of defendants' motion for a mistrial at this point (see *Anderson v. Chesapeake & Ohio Ry. Co.* (1986), 147 Ill. App. 3d 960, 498 N.E.2d 586; *Benuska v. Dahl* (1980), 87 Ill.

App. 3d 911, 410 N.E.2d 249), we agree that the comment when combined with other errors that occurred in the proceedings served to deprive defendants of a fair trial.

Included among the errors alleged by defendants are the trial court's action in allowing plaintiff's counsel to question Arco's maintenance superintendent, Richard Miriani, about the unavailability of maintenance and repair records relating to the accident; the court's restriction of defendants' cross-examination of Thad Aycock, plaintiff's reconstruction expert, based on the Dead Man's Act (Ill. Rev. Stat. 1981, ch. 110, par. 8—201); the court's action in allowing plaintiff's counsel to read into the record irrelevant matter from the statement of Anwar Younan, one of several witnesses who arrived on the scene shortly after the accident; and the court's use of the Dead Man's Act to exclude testimony by Kenneth Roland.

We find no error in plaintiff's counsel's cross-examination of Richard Miriani.

In *Terracina v. Castelli* (1979), 80 Ill. App. 3d 475, 400 N.E.2d 27, and *Foerster v. Illinois Bell Telephone Co.* (1974), 20 Ill. App. 3d 656, 315 N.E.2d 63, cases cited by defendants in support of their claim that the cross-examination was improper, this court held that defense counsel's comments in closing arguments, implying that plaintiffs' counsel had ulterior motives in failing to produce certain evidence, were improper and had no basis in the evidence. We find that these cases are inapplicable.

In the present case, Miriani testified on direct examination that Arco had a policy of retaining records for only a 12- or 13-month period. On cross-examination, plaintiff's counsel questioned whether this policy also applied in cases of accidents, where it was possible that the records might be needed in the future. We believe counsel's questions were reasonable, and we cannot agree with defendants' assertion that the questions were intended to insinuate that Arco had intentionally destroyed material evidence.

However, on the issue of defendants' questioning of plaintiff's reconstruction expert, Thad Aycock, we agree with defendants' contentions, and we find that the trial court improperly limited their cross-examination.

Defendants attempted to question Aycock about the materials he relied upon in reconstructing the accident. Following an objection by plaintiff, the trial court ruled that defendants could not ask whether Aycock considered statements made by Roland in reaching his conclusions.

■■ An expert witness may disclose the underlying facts or data

which form the basis for his opinion, even if this evidence is otherwise admissible. (See *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322.) In *Wilson*, the supreme court pointed out that the burden is on an adverse party during cross-examination to elicit the facts underlying the expert opinion. 84 Ill. 2d at 194.

The dissent contends that "[i]t is improper for counsel to ask questions in front of the jury on cross-examination, which by innuendo may detract from a witness' testimony, when there is no good-faith intention to follow up with proof of the facts to which counsel alludes," and adds that "[t]he practice of offering matters in the presence of the jury that counsel knows to be inadmissible, in a manner calculated to elicit objections and create an appearance of concealment on the part of opposing counsel, must not be condoned." 195 Ill. App. 3d at 580.

Here, however, defendants were not "offering matters," they simply were trying to determine what information Aycock took into consideration in reaching his conclusions. While it is true that defendants could not read out specific statements in Roland's deposition and ask whether Aycock considered each, defendants were entitled to inquire whether Aycock took the deposition into consideration. Further, if Aycock testified that he had considered the deposition, defendants were entitled to disclose to the jury the portions thereof that were considered.

Plaintiff contends that no error occurred because the record shows that Aycock did not consider Roland's statement. This contention is based on a statement made during a sidebar conference by plaintiff's counsel and, clearly, such a statement cannot be relied upon as establishing what materials Aycock considered in forming his opinions.

We find that the trial court also erred in allowing certain portions of Anwar Younan's statement to be read into evidence. On direct examination, Younan testified that when he arrived at the scene of the accident, he saw no lights on the truck. On cross-examination, defendants' counsel impeached Younan's testimony with a prior statement made December 17, 1981, in which Younan said that the truck had lights on the bottom of the trailer and on each end, but none on the top. Defendants later called Raymond Eastridge, the court reporter who transcribed Younan's December 1981 statement, to testify to the accuracy of the transcript. During plaintiff's cross-examination of Eastridge, the trial court allowed plaintiff's counsel to read into evidence a portion of Younan's statement in which he said that "normally," trucks would have lights on top. We agree with defendants'

contention that this was error.

Although plaintiff argues that the admission of this portion of Younan's statement was necessary to place the other portions of the statement in context, we find that this was not the case. In a statement made six months after the accident, Younan claimed that the truck had lights on the bottom of the trailer and on each end. This statement was used at trial to impeach Younan's testimony that he saw no lights on the truck when he arrived at the scene of the accident. Admission of the portion of the statement in which Younan said that trucks normally had lights on the top did not serve to complete or rehabilitate Younan's testimony, nor did it alter the fact that Younan's trial testimony was contradicted by his earlier statement. Rather, the statement served only to create the inference that Roland in some way had deviated from what was normal, and absent any foundation therefor, it was error to admit the statement.

Defendants' next assertion of error concerns the trial court's application of the Dead Man's Act to limit the testimony of Kenneth Roland.

Prior to trial, the trial court granted a motion *in limine* filed by plaintiff, pursuant to the Dead Man's Act, seeking to prohibit defendant Roland from testifying about anything that occurred after he left the Marathon terminal. Defendants contend that the trial court erred in using the Dead Man's Act to restrict Roland's testimony. They contend that plaintiff failed to provide any foundation in support of her motion to exclude Roland's testimony, that the trial court's application of the Act was too broad, and that Roland should have been allowed to testify regarding his actions as he drove down Marathon Road until he encountered decedent at the intersection.

The Dead Man's Act provides that in the trial of any action in which any party sues or defends as the representative of a deceased person, no adverse person may testify on his own behalf to any conversation with the deceased or to any event which took place in the presence of the deceased. The purpose of the Act is to bar only that evidence which the deceased could have refuted. *Malavolti v. Meridian Trucking Co.* (1979), 69 Ill. App. 3d 336, 387 N.E.2d 426.

Here, the "event" in question is the accident, and it is clear that the trial court properly barred Roland from testifying concerning the details of the collision. In addition, in light of testimony at trial that the stop sign on Marathon Road was visible from Busse Highway, the trial court properly prevented Roland from testifying as to whether he stopped at the stop sign before entering the intersection. However, statements in the record also indicated that the Marathon terminal

was located at least one block from Busse Highway, and there was no evidence whatsoever that a person travelling northbound on Busse would be able to observe a vehicle leave the terminal, nor was there any evidence of when a vehicle travelling west on Marathon would be visible from Busse Highway. In the absence of evidence establishing that decedent would have observed and been able to testify to Roland's actions before reaching the stop sign, it was error for the trial court to bar that portion of Roland's testimony.

Although we find that the trial court's application of the Act was too broad, we do not believe any prejudice resulted from the trial court's action. What additional testimony Roland would have given to establish that he exercised due care had he not been precluded from testifying about his actions after leaving the terminal and before reaching the stop sign is not apparent from the record. However, Roland was allowed to testify concerning Arco's maintenance and safety standards and as to his own safety inspections performed before and after each day's shift. Roland also testified that there was a five-mile-per-hour speed limit on Marathon Road, which was strictly enforced, and that on the night of the accident, the lights on his truck were on before he left the Marathon terminal. Given the short length of time involved and the necessarily limited nature of the testimony Roland could have given, we do not believe the barred testimony would have materially affected the result. *Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 476 N.E.2d 1232.

Defendants argue that the additional testimony was needed to dispel the impression created by improper testimony from one of plaintiff's witnesses concerning the custom and usage of unspecified other truck drivers using Marathon Road. In the plaintiff's case in chief, Willie Ridley, a friend of decedent's, testified about the manner in which trucks leaving the Marathon terminal entered the Busse Highway-Marathon Road intersection. Defendants' objection to the testimony was sustained and the testimony was stricken. However, plaintiff's counsel subsequently made several more attempts to elicit testimony from Ridley about the manner in which trucks entered the intersection before the trial court finally instructed him to discontinue the line of questioning and admonished the jury to disregard the testimony. We agree that there was no foundation for Ridley's testimony and we believe that counsel's actions were an example of what the dissent refers to as "the practice of offering matters in the presence of the jury that counsel knows to be inadmissible, in a manner calculated to elicit objections and create an appearance of concealment on the part of opposing counsel." 195 Ill. App. 3d at 580.

Defendants' final assertions of error concern the cross-examination of their medical witnesses on the issue of decedent's intoxication. Defendants contend that the trial court committed reversible error when it allowed plaintiff's counsel to impeach the medical witnesses using materials that were not established as authoritative.

On two occasions during his cross-examination of Dr. Yuksel Konacki, the assistant medical examiner who performed the autopsy on decedent, plaintiff's counsel read statements from an unidentified text and asked Konacki if he agreed with them. The statements read concerned "passive alcohol diffusion," a theory that alcohol present in the stomach at death diffuses into adjacent tissues and organs, causing a high level of alcohol in those organs that is not representative of the level of alcohol present in circulating blood. When defendants objected to plaintiff's counsel's actions, the trial court noted that a lawyer could question an expert from a learned treatise and reserved its ruling pending some showing that there was a scientific opinion on the subject. Plaintiff's counsel never identified the text to Konacki nor did counsel ask Konacki whether he considered the theory authoritative.

Subsequently, defendants filed a motion *in limine* seeking to prevent plaintiff from cross-examining witnesses from a text without identifying it and allowing the witness an opportunity to say that it was or was not authoritative. Although this motion was granted, plaintiff's counsel, when cross-examining another medical witness, again read from a text and asked the witness if he agreed with what was read without identifying the text or allowing the witness to state whether he considered it authoritative.

In *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, the Illinois Supreme Court stated that expert witnesses may be cross-examined as to their views of recognized authorities expressed in treatises or periodicals written for professional colleagues. The competence of the author of such a treatise or periodical can be established only by the testimony of a witness expert in the subject or by the trial judge taking judicial notice thereof. *Darling*, 33 Ill. 2d at 336.

In the present case, the materials used by plaintiff's counsel in cross-examining defendant's medical witnesses were never identified, the witnesses were not questioned concerning the author's competence, judicial notice was not taken of the author's competence, and plaintiff called no witnesses of her own to establish that the materials were authoritative. Therefore, it was error to permit the use of the materials. See *People v. Behnke* (1976), 41 Ill. App. 3d 276, 353

N.E.2d 684.

This error was compounded when the trial court, over defendants' objections, allowed plaintiff's counsel to argue the passive alcohol diffusion theory in his summation before the jury. Plaintiff presented no witnesses to establish that passive alcohol diffusion was possible, and the only evidence of the theory was the statements read by plaintiff's counsel from the unidentified text during his cross-examination of Dr. Konacki.

Further, when plaintiff's counsel cross-examined two other medical witnesses about the passive alcohol diffusion theory, one replied that there was no scientific data to support the theory and that he did not consider it authoritative. The other witness stated that the hypothesis was not well received in the scientific and medical community.

In light of plaintiff's failure to present any evidence establishing the theory, we find that it was error for the trial court to allow plaintiff's counsel to argue the theory in his closing arguments.

Defendants argue that the cumulative effect of this and the other errors that occurred during the proceedings served to deprive them of a fair trial. We agree. We also agree that the record fails to provide a basis for the jury's $2 million award and that the errors occurring at trial may have resulted in the jury's allocation of only 10% comparative negligence to decedent.

■■ As we stated above, a judgment should be reversed because of error only when the error prejudices a party or unduly affects the outcome of the trial. (*Khatib v. McDonald* (1980), 87 Ill. App. 3d 1087, 410 N.E.2d 266; *Chloupek v. Jordan* (1977), 49 Ill. App. 3d 809, 564 N.E.2d 650.) In the present case, we believe the repeated attempts by plaintiff's counsel to elicit improper testimony about the manner in which trucks using Marathon Road entered the intersection, the improper admission of the statement of Anwar Younan concerning what was "normal" for trucks, the failure of the trial court to allow defendants to cross-examine Thad Aycock concerning the basis for his expert opinion, the improper use by plaintiff's counsel of unidentified authority to cross-examine medical witnesses, and counsel's improper closing arguments resulted in prejudice to defendants.

On the issue of the amount of the damages awarded, it is well settled that the award of damages in a wrongful death action is within the discretion of the jury. (*Flynn v. Vancil* (1968), 41 Ill. 2d 236, 242 N.E.2d 237; *Long v. Bennett* (1978), 55 Ill. App. 3d 50, 370 N.E.2d 627.) However, the jury's discretion is not without limitation. (*Long v. Bennett* (1978), 55 Ill. App. 3d 50, 370 N.E.2d 627.) In reviewing a

jury's award of damages, a court has an obligation to carefully scrutinize the record to determine whether the amount of the verdict is so large as to indicate passion and prejudice. *Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 158 N.E.2d 63.

This action was brought on behalf of decedent's parents, who live in Kansas City, and his married sister, who lives in Texas. When a wrongful death action is brought for lineal next of kin, the law presumes substantial pecuniary loss arising from the relationship alone. (*Dotson v. Sears, Roebuck & Co.* (1987), 157 Ill. App. 3d 1036, 515 N.E.2d 105.) In the present case, the jurors were informed of this presumption and told that it did not extend to decedent's sister. The jurors were also instructed that in determining pecuniary loss they could consider money, goods, and services decedent had contributed to his survivors and was likely to have contributed in the future; decedent's age, sex, health, and other personal characteristics; and the relationship between decedent and his parents.

While decedent's sister did not testify, there was evidence that decedent enjoyed a normal, warm and loving relationship with his parents, that he visited them two to four times a year, that they exchanged gifts on Christmas and birthdays, and that decedent occasionally gave his parents cash gifts of $100 or less. Although this evidence served to buttress the presumption that decedent's parents suffered substantial pecuniary loss upon the death of their child (see *Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 499 N.E.2d 1373; *Bullard v. Barnes* (1984), 102 Ill. 2d 505, 468 N.E.2d 1228), we do not believe that it provided a sufficient basis for the jury's verdict of $2 million. Given the lack of any evidence to support an award of this size, we must conclude the amount of the award indicates that it was the result of passion and prejudice. *Lau v. West Towns Bus Co.*, 16 Ill. 2d at 453.

In conclusion, we find that the cumulative effect of the errors occurring at trial served to prejudice defendant. We also find that the record lacked any evidence justifying an award of $2 million and that the amount of the award precludes a finding that the errors occurring at trial did not affect both the jury's award of damages and its allocation of negligence. Therefore, the judgment of the circuit court of Cook County is reversed and the cause remanded for a new trial.

Reversed and remanded.

JUSTICE FREEMAN, specially concurring:
I agree with Justice White's determination that various errors

committed at trial deprived defendants of a fair trial on the issue of liability. However, I write separately because that determination obviates the need to address the alleged excessiveness of the damages awarded in this case. The determination that defendants were denied a fair trial on the issue of liability necessarily requires a new trial on the issue of damages as well.

I agree with Justice White that the trial court improperly limited defendants' cross-examination of plaintiff's reconstruction expert, Thad Aycock, in prohibiting them from asking whether he had considered any of defendant Roland's statement in forming his opinion as to the cause of the accident. However, I do not believe we need go so far as to conclude that, had defendants been allowed to ask that question, they would also have been entitled to disclose to the jury the portions of Roland's deposition that Aycock considered, if any. I have that belief, not because it would have been improper to disclose to the jury the specific statements by Roland upon which Aycock relied, if any, but because no one knows, without engaging in pure speculation and conjecture, what defendants would have subsequently asked had they been allowed to ask that first question. As such, the dissent's conclusion that "defense counsel wanted to cross-examine Aycock about Roland's statements in the presence of the jury solely for the purpose of having the jury hear evidence which was not admissible" (195 Ill. App. 3d at 579) is a paragon of speculation and conjecture or, to use the dissent's own colorful phrase, "a figment of an unwarranted presumption" (195 Ill. App. 3d at 578).

The support the dissent finds for that conclusion in defense counsel's rejection of the opportunity to question Aycock, outside the presence of the jury, regarding the basis of his opinion is ephemeral, at best. Having been denied their right under *Wilson v. Clark* to reveal to the jury what Aycock had and has not considered in forming his opinion, defense counsel acted eminently reasonably in declining the futile gesture of making that inquiry outside the jury's presence. Even had the defense learned through such questioning that Aycock had not relied on Roland's statements, the only way to inform the jury of that fact was through Aycock's testimony. Rather than attempting to detract, by innuendo, from Aycock's testimony, without a good-faith intention to prove up "the facts" to which counsel supposedly alluded, as the dissent so poetically and yet so inaptly puts it, defendants were acting well within their rights to reveal to the jury that Aycock had not considered Roland's statements in forming his opinion. Finally, the dissent's reliance on the fact that Aycock did not, in fact, base his opinion on anything stated by Roland to find no error

misses the point that the defense was entitled to reveal that fact to the jury as a means of impeaching Aycock's opinion.

I also agree with Justice White that the trial court abused its discretion in allowing into evidence the statement of Anwar Younan that "normally" trucks would have lights on the top. Even assuming, as the dissent argues, that the rest of Younan's deposition testimony relating to the lighting on Roland's trucks was admissible under the rule of completeness, the specific testimony that "normally" trucks would have lights on the top and that defendant Roland's did not was inadmissible.

That testimony essentially amounted to testimony that it was the custom in the trucking industry to have lights on top of trucks such as that involved in the accident in this case and that defendant Roland's truck did not comply with that standard. Such testimony by Younan, however, was inadmissible due to the failure of plaintiff to establish any foundation therefor, *i.e.*, to make any showing that Younan was sufficiently familiar, as an expert or otherwise, with the trucking industry that he could testify competently to its customary practices. *Cf. Crabtree v. St. Louis-San Francisco Ry. Co.* (1980), 89 Ill. App. 3d 35, 411 N.E.2d 19 (expert witness not acquainted with defendant's operations could properly testify to custom and practice of railroad industry in moving and lifting kegs of railroad spikes where his testimony demonstrated familiarity with the custom and practice of three railroads in such regard).

Unlike the situation in *Crabtree*, there was no showing here of Younan's familiarity with the trucking industry to render him competent to testify as to its normal customs and practices. Contrary to the dissent's implication in noting that Younan had been a truck driver, I do not believe that fact alone rendered him competent to testify to the normal customs and practices of the trucking industry. The trial court erred for this additional reason in allowing Younan's statement into evidence that "normally" trucks have lights on the top.

I further agree with Justice White that it was reversible error to allow plaintiff's counsel to use an unidentified text by an unidentified author to cross-examine defendants' experts.[1] The precise rule stated in *Darling* is that experts may be cross-examined "as to the views of recognized authorities, expressed in treatises or periodicals written for professional colleagues. [Citation.] The author's competence is es-

---

[1] The dissent has incorrectly attributed testimony of Dr. Hughes, defendants' neurophysiological expert, to Dr. Konacki, the pathologist who conducted the post-mortem examination of decedent, and testimony of Dr. Konacki to Dr. Hughes.

tablished if the judge takes judicial notice of it, or if it is established by a witness expert in the subject." *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 336, 211 N.E.2d 253.

Implicit in the rule stated in *Darling*, for the use of a treatise in cross-examination of an expert, is the requirement that the publication being so used and its author be identified to the witness and the trial court.[2] That requirement is implicit in the rule because, without their identification, it could never be determined at trial whether the authority being so used is "recognized" and whether its author is competent. As such, the dissent's conclusion that *Darling* was inapplicable in this case, where plaintiff's counsel indisputably read from some unidentified publication by some equally unidentified author in cross-examining defendant's experts, *because* he did not identify the work from which he was reading but merely asked general propositions is sophistry. It is precisely to preclude counsel from impeaching expert witnesses in the manner attempted here that the rule in *Darling* exists. The dissent's rationalization of the conduct of plaintiff's counsel in this regard puts a premium on subterfuge and chicanery. No court and no judge at any level should condone such conduct by counsel regardless of the ends sought to be achieved by doing so.

I further agree with Justice White that the trial court's error in allowing plaintiff's counsel to argue the passive alcohol diffusion theory before the jury compounded the error in allowing him to cross-examine defendants' experts without identifying the work from which he was reading or its author. Although the dissent deftly sidesteps the *Darling* issue, its justification of counsel's conduct in this latter regard completely ignores a fundamental rule of trial procedure. That rule is that evidence used for impeachment cannot generally be used as substantive evidence. The rule applies to medical treatises used to impeach expert witnesses. (*Piano v. Davison* (1987), 157 Ill. App. 3d 649, 510 N.E.2d 1066; *Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463 N.E.2d 216; *Fornoff v. Parke Davis & Co.* (1982), 105 Ill. App. 3d 681, 434 N.E.2d 793.) Moreover, even accepting the dissent's characterization of the statements read by plaintiff's counsel as mere general propositions, it cannot be seriously contested that those statements

---

[2]The requirements of identifying a treatise used in cross-examination as well as its author have long been recognized in the law. See *Scneder v. Wabash R.R. Co.* (Mo. 1954), 272 S.W.2d 198, 207; *Gulf, C. & S. F. R. Co. v. Farmer* (Tex. 1909), 115 S.W. 260, 262, *overruled on other grounds Sanchez v. Schindler* (Tex. 1983), 651 S.W.2d 249.

were not substantive evidence of the assertions made therein, if not due to the failure of any of defendants' experts to accept their validity and to plaintiff's counsel's failure to identify the work and author quoted, then due to plaintiff's failure to prove up the statements through her own witnesses. In short, even conceding the testimony raising the possibility of errors in the post-mortem blood analysis, there was no substantive evidence tending to support plaintiff's theory of passive alcohol diffusion which counsel could have properly referred to in arguing to the jury.

Moreover, Dr. Schaffer's mere concession that "probably there are a number of people" who believe the theory of passive alcohol diffusion, upon which the dissent heavily relies to justify counsel's argument of the theory to the jury, is a slender thread which snaps under the tug of scrutiny. Dr. Schaffer also testified, when asked whether he knew of any authoritative literature supporting the passive alcohol diffusion theory:

> "There have been numerous citations, and they have not been peer reviewed and do not appear in the literature, but they appear as manuscripts written by certain experts that testify in these related matters dealing with the phenomenon of passive diffusion or some type of diffusion process whereby after death the alcohol leaves the stomach contents and diffuses through the rest of the body, and then this is what you pick up when you measure an alcohol determination.
>
> There has never been any scientific data to support such, and for that reason, I personally do not consider it authoritative."

Thus, Dr. Schaffer's testimony, *in toto*, provided little support, if any, for the theory of passive alcohol diffusion. In view of that fact and defendant's other experts' unequivocal rejection of the theory, Dr. Schaffer's mere concession that a number of unidentified people subscribed to the theory was insufficient evidentiary support to allow plaintiff's counsel to argue the theory to the jury as substantive evidence, especially in view of plaintiff's failure to prove up the theory through any witnesses of her own. In addition, there certainly was no evidentiary basis for counsel's argument that "there are *articles* out there" supporting the passive alcohol diffusion theory.

I believe that the last two related errors committed by plaintiff's counsel so prejudiced defendants that they alone warrant a new trial on liability and, thus, on damages. Moreover, I do not be-

lieve that it can rationally be contested that all of the errors cited in Justice White's opinion and in this opinion *cumulatively* denied defendants a fair trial on all issues. However, given the errors infecting the jury's finding of liability, I do not believe we need address the issue of the excessiveness of the verdict.

JUSTICE RIZZI, dissenting:

I dissent. I would affirm the judgment.

The majority first claims that there was error during the *voir dire*. Although the majority finds that the error was "highly improper," it also finds that there was "no abuse of discretion in the trial court's denial of defendants' motion for a mistrial on this point." While I believe that the majority's findings are inconsistent, I also believe that nothing improper occurred during the *voir dire*.

The law firm representing the defendants is Baker & McKenzie. During the *voir dire*, plaintiff's counsel asked one of the prospective jurors if she had heard of the law firm of Baker & McKenzie. Counsel then asked: "Do you know any of the 150 attorneys that work there?" No immediate objection was made, but defense counsel later made a motion for mistrial. The court denied the motion, and no further comment was made on the size of Baker & McKenzie. In my opinion, the trial court acted properly for several reasons.

In the first instance, I do not see how defendants were prejudiced merely because the jury knew that there are 150 attorneys working at Baker & McKenzie's Chicago office. Indeed, most large law firms, like Baker & McKenzie, promote and disseminate the fact that they are a large law firm, including the high number of attorneys that work at the firm. Large law firms cannot have it both ways, on the one hand promoting and disseminating the high number of attorneys that work at their firm, and on the other hand claiming that they are somehow prejudiced if a juror knows of the very facts that they themselves are promoting and disseminating. Surely, no one would conclude that if a juror knew that there are 150 attorneys working at Baker & McKenzie it would be grounds for disqualification. Yet, that conclusion is a logical extension of the majority's reasoning. Moreover, the fact that a large corporation like defendant Arco Petroleum Products Company is represented by a large law firm is hardly unexpected. Under the circumstances, I see no prejudice by plaintiff's counsel's question.

In the second instance, I do not believe that any error occurred.

An element essential to the integrity of the jury process is that the parties to the litigation have a reasonable opportunity at the *voir dire* to ascertain that the fact-finding body is free from influence-producing relationships unfavorable to them. (*Watson v. Fischbach* (1973), 54 Ill. 2d 498, 501, 301 N.E.2d 303, 305.) In my opinion, the question asked by plaintiff's counsel was asked in this vein.

During the course of their lives, the public hears the names of many law firms of varying sizes bandied about in all kinds of conversations and communications. However, it is fair to assume that at any particular time law firms have a nebulous identity to members of the public. Thus, if a prospective juror is asked if he or she knows any of the "150 attorneys that work" at a particular law firm, the size of the law firm may serve as an *aide memoire* and allow the prospective juror to let counsel know whether he or she in fact knows of any of the attorneys at the law firm representing the other side in the litigation. Thus, I believe that merely stating the number of attorneys that work at the law firm representing one of the litigants, in the manner that was done in this case during the *voir dire,* has a valid purpose.

Accordingly, I believe that plaintiff's counsel's question was proper because it afforded the plaintiff a reasonable opportunity to ascertain whether the prospective juror might be free from influence-producing relationships unfavorable to the plaintiff. I also believe that the defendants were not prejudiced by the question. Moreover, the doctrine of *de minimis non curat lex* plainly applies if one believes error had occurred; the matter therefore cannot be part of a "cumulative effect" of errors which might have affected the trial. In my opinion, the majority's conclusion "that plaintiff's counsel's statement served no purpose, except to draw attention to the size of defendants' law firm" is a figment of an unwarranted presumption.

The majority next discusses the defendant's contention "that the trial court erred in using the Dead Man's Act to restrict Roland's testimony." On this point, I agree with the majority's belief that no "prejudice resulted from the trial court's action." I also agree with the majority's conclusion: "Given the short length of time involved and the necessarily limited nature of the testimony Roland could have given, we do not believe the barred testimony would have materially affected the result.

Next, the majority discusses the plaintiff's cross-examination of Richard Miriani. I agree with the majority's conclusion: "We find no error in plaintiff's counsel's cross-examination of Richard Miriani."

The majority next discusses the issue of defendants' questioning of plaintiff's reconstruction expert. The majority concludes: "[W]e agree with defendants' contention that the trial court improperly limited their cross-examination. Defendants attempted to question Aycock about the materials he relied upon in reconstructing the accident. Following an objection by plaintiff, the trial court ruled that defendants could not ask whether Aycock considered statements made by Roland in reaching his conclusions. An expert witness may disclose the underlying facts or data which form the basis for his opinion, even if this evidence is otherwise inadmissible. (See *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322.) Therefore, defendants were entitled to determine whether Aycock took Roland's statements into consideration and the trial court erred when it ruled that the Dead Man's Act precluded defendants' questions." I disagree.

The record clearly shows that none of Aycock's opinions were based upon anything stated by Roland, but rather Aycock's opinions were based on his own visit to the scene. Thus, the trial court's order blocking cross-examination based upon Roland's statements to the police and in his deposition was proper. To me it is plain that defense counsel was not attempting to cross-examine Aycock about Roland's statements for the limited purpose of explaining the basis of his opinions, as would be permitted under *Wilson v. Clark.* Rather, defense counsel wanted to cross-examine Aycock about Roland's statements in the presence of the jury solely for the purpose of having the jury hear evidence which was not admissible. This is clearly demonstrated by the colloquy that occurred between the court and counsel:

"DEFENSE COUNSEL: Well, judge *** I'm entitled to elicit admissions from him that, in fact, he was aware of other statements or information or material and that either he discounted those or didn't consider those. *** That's all part of the credibility of this witness, and it's all part of his *modus operandi,* what does he consider that he used, what did he specifically exclude in coming to these conclusions.

THE COURT: All right. Any reference to whether he considered anything that Mr. Roland may have said would create a problem, and if you insist on knowing this, I'll let you ask it outside the presence of the jury, whether or not he considered any of the matters that Mr. Roland may have said either to the police or in his deposition, but I will agree with [plaintiff's counsel] that we should not ask him whether he consid-

ered or made it in any way appear that he may have considered anything Mr. Roland said in front of the jury. That's my ruling.

DEFENSE COUNSEL: Well, I'm at a loss, your honor. I don't understand something. I'm asking if there's something that he didn't consider.

THE COURT: Well, you're doing it indirectly. I would ask you not to refer to the deposition of Mr. Roland in front of the jury. If you want to find out, I'll bring him right back in here now. *** You can inquire in a different fashion, but I will now instruct you not to ask any questions concerning Roland's deposition or anything that Roland may have told to the police or to infer that this may have been considered. If you want to find it out, I'll let you do it outside the presence of the jury. That's my ruling."

Defense counsel never accepted the court's invitation to question Aycock outside the presence of the jury. It is improper for counsel to ask questions in front of the jury on cross-examination, which by innuendo may detract from a witness' testimony, when there is no good-faith intention to follow up with proof of the facts to which counsel alludes. The practice of offering matters in the presence of the jury that counsel knows to be inadmissible, in a manner calculated to elicit objections and create an appearance of concealment on the part of opposing counsel, must not be condoned. When, as in the present case, a trial judge prevents such tactics from occurring in his or her courtroom the trial judge should be commended not reversed. I commend the trial judge here.

The majority also finds that "the trial court also erred in allowing certain portions of Anwar Younan's statement to be read into evidence." Anwar Younan is a cab driver and a former truck driver. He was one of the first persons to arrive at the accident scene. At trial, he testified that he saw no lights on the Arco tanker until he was nearly upon it. On cross-examination, defense counsel impeached Anwar Younan with the use of an unsigned court reporter's statement that had been previously taken of the witness. The following occurred:

"Q. Do you remember being asked this question and giving this answer:

Q. No problem, with visibility?

A. No. It was night time.

Q. Did the truck have any lights?

A. It had one over here and one over here.

Q. You are indicating—you are saying the truck had lights on the bottom of the tanker and one on each end?

A. Yes.

Q. None on top?

A. No.

Q. Do you remember being asked those questions and giving those answers?

A. Yes."

Although Anwar Younan admitted at trial that he had made the previous answers to the questions that had been asked him, he testified that he did not remember the court reporter asking him the questions and he did not remember the court reporter. Defense counsel then called the court reporter to testify at trial to the same series of questions and answers that had been asked of and answered by Anwar Younan at trial. After this had been accomplished, plaintiff's counsel sought to inform the jury of the complete statement that Anwar Younan had given the court reporter relating to the lights on the truck. When plaintiff's counsel attempted to cross-examine the court reporter for that purpose, defense counsel objected and the following occurred outside the presence of the jury:

"PLAINTIFF'S COUNSEL: First of all, there's [sic] multiple answers to his objection. Number one is I don't think this is impeaching. That's number one.

Take a look at what he's saying over here. He says, no problem with visibility, no. And the court has heard this witness testify in court, and the court knows that there's a language problem with this witness generally.

And keep in mind what he's saying over here. When he was asked at trial whether or not there were any lights on the side of the truck, he says, no, it was dim, he didn't see any.

Now, over here at the statement, he says, 'It was night-time, the truck didn't have too many lights on top.'

I don't know what that means. Certainly, it's too many lights on top. That's what he has written, okay. 'Did the truck have any lights? It had one over here and one over here.'

Well, I don't know what that means because one over here and one over here—and he doesn't say whether or not the lights are on or off by the way.

* * *

First of all, I think the whole context should be read to the jury, and not that portion. If it is impeaching, the whole context should come out, not just that portion that counsel likes

the jury to hear.

Because if you read everything, in my opinion, it is completely consistent with his testimony here. There is no indication over here that he's saying anything which is inconsistent, and if there are inconsistencies, the inconsistencies are so minor that it doesn't amount to impeachment. Because you don't have direct answers and direct questions on the same issues that he talked about over—during the trial of the case.

So for those reasons, we think that the jury should hear the entire discussion as opposed to just part of them."

The trial court denied defense counsel's objection, and plaintiff's counsel completed his cross-examination of the court reporter as follows:

"Q. And were these also, these questions and answers, transcribed by you?

'Question: And none on top?'

The answer was, 'No'; is that correct?

A. That's right.

Q. And then another question, 'And normally there should be lights on top?' And the answer is, 'Yes'?

A. Yes.

Q. And then he said, 'But this particular one didn't?' And he answered, 'No'; is that correct?

A. Right.

Q. And then he said, 'Did you notice if the truck's headlights or taillights were on'; is that correct?

A. Yes, sir.

Q. He said, 'Yes, the truck was still—I'm sorry—the truck was running still until some guy told him to cut it off.' Was that the answer?

A. Yes, sir, it was."

The basis for allowing plaintiff's counsel to complete his cross-examination of the court reporter was stated by the trial court as follows:

"THE COURT: First, I believe that there is a basis for impeachment. The witness said there were no lights on the side of the truck. This appears to indicate that there were.

We have in the law regarding statements used for impeachment a principle known as the rule of completeness, where it is indicated where part of the statement is used for impeachment, if there are further questions on the same proposition which may shed light on that same general area, they can be

brought out on redirect as part of rehabilitation.

I do not agree with defense counsel that there is anything prejudicial or speculative about the question that would be—that would prevent the words, 'and normally there should be lights on the top.' If the witness is talking about seeing—that there is any basis in fact that the tankers normally or trucks normally have lights on the top, and that's what he's saying here, I don't think it's prejudicial, and particularly because the rest of his answer about this not having—it partially explains the impeachment.

In other words, it didn't have lights on the top, but it did on the bottom and so on. So it does help explain somehow, and I will not—I will hold that it is properly before the jury.

They can reasonably conclude that this is impeaching, and certainly, I will let them consider it for that purpose.

But I will under the rule of completeness allow you to ask a complete set of questions on the questions of lights even though whether he would—is familiar with tankers and knows there are lights on top might be a matter of speculation. But it is part of the complete answer, and I'll let it in."

I believe the trial court acted within the bounds of its discretion in allowing plaintiff's counsel to complete his cross-examination of the court reporter. It is well established that if one party introduces part of an utterance or writing, the opposing party may introduce the remainder or so much thereof as is required to place that part originally offered in proper context so that a correct and true meaning is conveyed to the jury. (*Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 556, 356 N.E.2d 779, 786.) Also, the admission of such evidence is within the discretion of the trial court. (*Buczyna v. Cuomo & Son Cartage Co.* (1986), 146 Ill. App. 3d 404, 413, 496 N.E.2d 1116, 1122.) Here, the record does not demonstrate that the trial court abused its discretion.

I believe it is plain that it was within the trial court's discretion to allow plaintiff to put into evidence the complete statement of Anwar Younan to show that, when placed in its complete context, the statement indicated that there were no lights on the top of the Arco tanker. I therefore disagree with the majority that the trial court erred in allowing plaintiff to put into evidence the complete statement of Anwar Younan.

The majority next claims that the trial court committed error "when it allowed plaintiff's counsel to impeach the medical witnesses using materials that were not established as authoritative."

The majority relies upon the authority of *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253. The obvious errancy in what the majority has to say on the subject is that it is simply not applicable to this case. Plainly *Darling* is not applicable here.

The majority first refers to two occasions during the cross-examination of Dr. Yuksel Konacki. The record reflects that the following occurred on the two occasions:

"Q. If I understand you, then, correctly, if we took the three people that we talked about before, all right, and you gave them five beers, that would get them up to .155?

A. Well, remember it was between five and six one after the other.

Q. All right. One right after the other and the three people, one 16 years old, one who had been drinking all of their [*sic*] life and a person who is just a social drinker, you're saying that in your opinion all three people at .155 would be affected about the same; is that correct?

A. You can predict that all three that there would be certain changes, and it is possible that one might be slightly more affected than the other. But in all three, you can have certain prediction of change.

Obviously, no two people in the world are going to have exactly the same reaction. But when .155 is achieved, then you can predict well that certain changes will occur.

Q. Would you agree with this statement, sir—.

MR. KARNES: Objection, your Honor. Absent identification of the document to have him put through to identify the—

THE COURT: Well, it can be done either one of two ways. One is the way you mentioned. The other is if you want to ask a general question but where it does not appear that you're reading from a particular document, I'll permit it, the understanding being that before you could ask him a specific question from the document, there has to be some foundation that there is an authoritative source.

So you can ask him a general question if he agrees with the proposition. But before you can use a particular document, you'd have to—

MR. FISHMAN: I'm just going to ask him this question.

THE COURT: Sure.

BY MR. FISHMAN:

Q. Doctor, do you agree with this proposition: 'Individual

differences in response and tolerance for alcohol vary so widely that one person may be incapacitated by less than the legal limit of alcohol goes while others show almost no response to a fairly high blood alcohol reading.' Do you agree with that?

A. I agree with it only to the point of the visible changes that you might perceive in those individuals that, I repeat again, when you test the individual carefully, then there are repeated kinds of changes that you can predict, predictable changes.

And I'm referring now that what we went into in the past hour about the ability of some individuals over a time to camouflage the affect of alcohol on himself or herself.

Some people are very good at that. But if you test them carefully as to their fine motor control, then that whole camouflage system disappears and breaks down.

So the variation that you're referring to is the ability of some people after drinking a lot over a long period of time to camouflage what the affects are.

Q. Well, then, do you agree with this statement: 'Both an acquired tolerance for alcohol in individual genetic differences accounts for wide variations in response.'

MR. KARNES: Your Honor, you know my objection. Counsel is no longer paraphrasing but bringing up questions on his own and reading in the record when the doctor hasn't proven it to be authoritative or offered it as authoritative.

THE COURT: No. Again, the situation is he may ask him general propositions. And as long as he doesn't indicate that this is from some article or some authority, I will permit him to do so. So your objection is overruled.

MR. KARNES: Thank you, your Honor.

BY THE WITNESS:

A. The genetic differences here, I think, are referring to the fact that one can inherit a tendency from previous family, mother and father, of the desire to take the alcohol and maybe even the ability to camouflage the affects of it."

Plaintiff's counsel then moved on to another line of questioning.

The majority secondly refers to plaintiff's counsel "cross-examining another medical witness." Although the majority does not identify the other medical witness by name, his name is Dr. John Hughes. The record reflects that the following occurred with respect to the cross-examination of Dr. John Hughes and what is discussed by the majority:

"Q. Doctor, can you just tell the Court and jury what the word 'osmosis' means?

A. It is a diffusion of the fluids through the membranes in the body.

Q. Through the what?

A. Through the membranes.

Q. Through the membranes?

A. Through cell membranes.

Q. Okay. It's—how does that happen?

A. There might be some diffusion of the fluids through the membranes.

Q. Now, if I understand correctly, if a person is dead, osmosis still goes on; is that right?

A. I don't know, sir.

Q. Well, if a person is dead, and they have alcohol in the stomach, isn't it correct, sir, that the alcohol will continue to go through the stomach wall into the surrounding cavity if there is liquid on the other side; isn't that right?

A. I don't know, sir.

Q. Isn't it correct, sir—have you ever studied forensic science on postmortem examinations?

A. Yes.

Q. When you did—when the autopsy that was performed on the blood alcohol, that would be the blood alcohol that you got out of the body at the time you got the blood alcohol out of the body; is that correct?

A. I gave them that, the lab sample, the blood sample.

Q. The blood sample, though—

A. It was taken after death, sir, certainly.

Q. Sir, Doctor—

A. Yes, sir.

Q. —do you agree with this statement, 'If any alcoholic beverage is still present in the stomach during the time of death, it continues to diffuse into the adjacent tissues and organs from which it no longer is distributed throughout the body by circulating blood.' Do you agree with that statement?

A. I don't know, sir.

Q. You don't know, okay. Would you agree with this statement? 'With succeeding hours after death, blood drawn from such organs as the heart or any of its great vessels, if alcohol was present in the stomach when death occurred, will contain increasingly high levels of alcohol that are entirely unrepre-

sentative of the level existing in the circulating blood.'

    A. I don't know, sir."

As the record clearly shows, at no time during the cross-examination of Dr. Yuksel Konacki or Dr. John Hughes did plaintiff's attorney mention the name of any article, book or other expert. Thus, the learned treatise doctrine relating to cross-examination of expert witnesses has no application here, and defendants' objections were properly denied.

I agree with the trial judge and his ruling when he stated: "Again, the situation is he may ask him general propositions. And as long as he doesn't indicate that this is from some article or some authority, I will permit him to do so. So your objection is overruled." Moreover, the scope of cross-examination rests within the discretion of the trial court, and the trial court's discretion should not be applied in a narrow or restricted manner with respect to experts who deal in opinions on matters normally not in the common knowledge and experience of laymen. (*Muscarello v. Peterson* (1960), 20 Ill. 2d 548, 554, 170 N.E.2d 564, 568.) Also, an exercise of discretion by the trial court on matters relating to cross-examination will not be disturbed on review unless there has been a clear showing of an abuse of discretion. (*Martin v. Zucker* (1985), 133 Ill. App. 3d 982, 988, 479 N.E.2d 1000, 1004.) Here, I do not find that the trial court abused its discretion during the cross-examination of Dr. Yuksel Konacki or Dr. John Hughes. Plainly, there is no clear showing of an abuse of discretion.

The majority next claims that the trial court erred with respect to plaintiff's closing argument to the jury. The majority states: "In his summation, plaintiff's counsel argued the passive alcohol diffusion theory, suggesting that the passage of blood through decedent's stomach after his death led to a 'false high' blood alcohol reading. Defendants objected to plaintiff's counsel's statements but their objection was overruled." The majority then concludes that "it was error for the trial court to allow plaintiff's counsel to argue the theory in his closing arguments." I disagree.

At trial, the jury heard evidence from witnesses who were with Knox on the night of his death. They testified that Knox consumed no more than two beers. The same witnesses also testified that Knox was not in any way impaired at the time he left Willie Ridley's home. However, the jury also heard evidence consisting of a toxicology report stating that Knox's blood-alcohol level taken after his death indicated a concentration of .155 with a bile-alcohol reading of .14.

To resolve the conflict in the evidence, plaintiff cross-examined

witnesses called by the defense to show that the alcohol readings did not accurately reflect Knox's consumption of alcohol immediately prior to his death. Plaintiff showed that although an accurate blood-alcohol analysis requires drawing blood from the heart, the pathologist could not recall the origin of the sample taken from Knox. The alcohol tests could also have been invalidated because of a rupture of the aorta which drained most of Knox's blood from his major blood vessels into the thoracic cavities. Any of these errors may have resulted in an erroneous calculation of Knox's alcohol concentration. In addition, Dr. Schaffer, the toxicologist, recognized that there is support for the belief that even after death, alcohol diffuses through the stomach. Although he did not subscribe to such an opinion, Dr. Schaffer stated: "Probably there are a number of people who believe that. I'm not exactly sure that I would agree necessarily with that statement."

During plaintiff's counsel's closing argument, the following occurred:

"So when he died, there was alcohol in his stomach. Now, what does that mean? It means that the alcohol was in his stomach when he's dead. Now, the question is, did the alcohol get out of the stomach—.

DEFENSE COUNSEL: Objection, your Honor.

THE COURT: This is argument. There may not be any direct evidence that there was alcohol in his stomach, but I suppose that he can argue that there was based upon the facts of what took place at the—prior to the accident."

Plaintiff's counsel then continued his argument by describing the theory, which Dr. Schaffer admitted has at least some support, that alcohol could have diffused from Knox's stomach into his blood to produce false alcohol concentrations. No text was read to the jury by plaintiff's counsel, and he did not argue anything that was not in evidence or a fair comment upon the evidence.

I believe it is plain that when it came time for the plaintiff and defendants to argue their cases to the jury, the jury was faced with legitimate conflicting evidence and theories. On behalf of the plaintiff, there was testimony of witnesses who were with Knox on the night he died, who stated that Knox was not the least bit impaired from having consumed only one to two beers. From the physical facts of the accident as reconstructed by Thad Aycock, the consultant to the Accident Investigation Division of the Northwestern University Traffic Institute, Knox was only 145 feet from the collision when the tanker truck pulled out from a stop sign in front of Knox

and blocked Busse Highway. Moving at 45 miles per hour, Knox slammed on his brakes, laying approximately 50 feet of skid marks, and he attempted to move to his left to avoid the tanker truck, but Knox had no opportunity to avoid the collision, which occurred 2.5 seconds from the time the truck pulled out onto Busse Highway. On behalf of the defendants, there was the postmortem protocol which provided that Knox had a blood-alcohol concentration of .155 at the time the postmortem examination was made.

Given the questions raised through the crucible of cross-examination of defendants' witnesses as to the reliability of the postmortem protocol, two different theories exist as to whether the postmortem protocol truly showed the alcohol concentration in Knox's blood immediately prior to his death. Both plaintiff and defendants had the right to argue their respective theories and interpretation of the facts and circumstances to the jury. That is what was done.

The arguments that were made by plaintiff's attorney and defendants' attorney were fair and subject to the discerning and keen intellect of a commensal cross-section of the community who sat as the jury. In reaching their verdict, the jurors applied their intellectual perceptions to all the evidence in light of their own observations and experiences in the affairs of life. I believe that the majority's conclusion that the plaintiff's attorney's argument was unfair and that both the trial judge and the jury were wrong in what they did constitutes a usurpation of the functions of the trial court and the jury.

Perhaps the most glaring mistake made by the majority, in my opinion, relates to the next issue discussed by the majority. On the issue of the amount of the verdict, the majority states: "We also agree [with defendants] that the $2 million award was excessive." The majority also states: "Although this evidence served to buttress the presumption that decedent's parents suffered substantial pecuniary loss upon the death of their child [citations], we do not believe that it provided a sufficient basis for the jury's verdict for $2 million. Given the lack of any evidence to support an award of this size, we must conclude the amount of the award indicates that it was the result of passion and prejudice. In conclusion, we find that because it would be impossible to state that the errors occurring at trial did not affect both the amount of the jury's award and its allocation of negligence, the judgment must be reversed and the cause remanded for a new trial." I disagree.

The jury returned a verdict in favor of the plaintiff for $2 million and found that "the percentage of negligence that was a proxi-

mate cause of plaintiff's death or damages attributable solely to the plaintiff is 10%." Accordingly, the amount of recoverable damages awarded by the jury is $1,800,000.

The decedent was born in 1951, received "good grades all the way through high school," and he "went to college for a couple of years." At the time of his death, he was employed by Household Finance, earning between $25,000 and $30,000 a year. His health was excellent. The decedent, who was described as "ambitious" and a "very happy person," maintained a relationship with his parents "through telephone calls, writing, coming home and all that." The decedent's father testified that his son's death meant that he "lost a friend, a loved one," and that he lost the support that he "would have in case, you know, if I should happen to need it." The decedent's mother stated that she lost "everything a person would want in a son." She testified that her son was "someone to talk to and someone to love." During the time that the decedent's sister was attending Creighton University in Omaha, Nebraska, the decedent contributed approximately $50 a week toward her support. This latter fact evinces the filial support the decedent's parents expected from him.

When a decedent leaves parents, the law recognizes a presumption that the parents have sustained some substantial pecuniary loss by reason of the death. The weight to be given this presumption is for the jury to decide from the evidence in the case. (Illinois Pattern Jury Instructions, Civil, No. 31.06 (2d ed. 1971).) In terms of loss of society, which is involved in this case, society is defined as the mutual benefits that each family member receives from the other's continued existence, including love, affection, care, attention, companionship, comfort, guidance, and protection. (*Drake v. Harrison* (1987), 151 Ill. App. 3d 1082, 1087-88, 503 N.E.2d 1072, 1076.) These principles of law were given to the jury in the form of jury instructions. Moreover, all of the jury instructions were tendered and given on behalf of defendants.

Plainly, the observations and experiences in the affairs of life of reviewing court judges cannot take precedence over those of the jury when it comes to determining how much money is reasonable compensation for the presumption of pecuniary loss for the death of a son. Nor can the observations and experiences in the affairs of life of reviewing court judges take precedence over those of the jury when it comes to determining how much money is reasonable compensation for the loss of love, affection, care, attention, companionship, comfort, guidance and protection that the parents of a

son suffered as a result of his wrongfully caused death. Yet, in the present case the majority has arrogated to itself the right to usurp what the jury determined on both issues.

In addition, it must be noted that the defendants introduced no evidence whatsoever to rebut the presumption of substantial pecuniary loss and the loss of society. Nor did the defendants make any argument to the jury concerning damages. Also, the jury was accurately instructed on the law based upon instructions tendered by the defendants. Thus, it is clear that there is no error as to evidence, argument or law relating to the presumption of substantial pecuniary loss or the loss of society in this case.

The majority states that "the amount of the award indicates that it was the result of passion and prejudice." However, the majority does not make any textual discussion about passion or prejudice relating to the amount of the award. The majority's statement is merely an *ipsi dixit* assertion. I believe that the majority simply disagrees with the jury on the amount of the award. The majority is entitled to disagree with the jury, but that does not give the majority the entitlement to disturb the decision of the jury.

Next, the majority concludes that "because it would be impossible to state that the. errors occurring at trial did not affect both the amount of the jury's award and its allocation of negligence, the judgment must be reversed and the cause remanded for a new trial." I know of no other reviewing court panel that has set an "impossible to state" no affect standard for reviewing courts when examining whether trial errors may have affected the amount of a jury's award or its allocation of negligence. The standard to be applied for a reversal and new trial because of trial errors is that the reviewing court must affirmatively conclude that there were trial errors which operated to the prejudice of the appellant or "unduly affected" the outcome below. (*Chloupek v. Jordan* (1977), 49 Ill. App. 3d 809, 817, 364 N.E.2d 650, 656.) Plainly, that standard cannot be met here. Moreover, in order for a reviewing court to reverse a jury's determination of plaintiff's percentage of comparative negligence, the verdict must be against the manifest weight of the evidence. (*Lowe v. Kang* (1988), 167 Ill. App. 3d 772, 782, 521 N.E.2d 1245, 1251.) Here, the majority never even discusses whether the jury's verdict allocating 10% of the fault of the accident to the decedent is against the manifest weight of the evidence. I do not find that the jury's verdict allocating 10% of the fault of the accident to the decedent is against the manifest weight of the evidence.

Lastly, the majority states that "the jury's allocation of only 10% comparative negligence to decedent may have been the result of the improper conduct of plaintiff's counsel and the trial court's failure to control that conduct." I disagree with the premise and the conclusion. This case involved a trial that was hard fought on both sides. The trial may not have been perfect, but it was fair. There was no improper conduct by plaintiff's counsel, and to say that the trial court failed to control the conduct of either counsel is wrong. The record plainly demonstrates that the trial court controlled the conduct of both counsel and gave both sides a fair trial. The trial court should be commended, not reversed.

Accordingly, I would affirm the judgment of the trial court.

## ADDENDUM

This dissent was filed in response to the majority opinion as it was originally filed before it was modified on rehearing. At that time, Justice Freeman agreed with everything that Justice White included in the majority opinion, including "the alleged excessiveness of the damages awarded in the case," since Justice Freeman concurred and did not file a specially concurring opinion. The original opinion in which Justice Freeman concurred and my dissent were filed on November 22, 1989. After a petition for rehearing was filed, as the order entered today provides, I voted to grant the petition for rehearing and Justices White and Freeman voted to deny the petition; also, the modified majority opinion and Justice Freeman's specially concurring opinion were filed. I do not believe that anything contained in the specially concurring opinion has sufficient merit to warrant a response.